UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION

GEORGE T. SULLIVAN                                        PETITIONER
ADC #610057

V.                            NO. 5:17-CV-00147-JLH-JTR

WENDY KELLEY, Director,
Arkansas Department of Correction                         RESPONDENT

## RECOMMENDED DISPOSITION

The following Recommended Disposition ("Recommendation") has been sent to United States District Judge J. Leon Holmes. You may file written objections to all or part of this Recommendation. If you do so, those objections must: (1) specifically explain the factual and/or legal basis for your objection; and (2) be received by the Clerk of this Court within fourteen (14) days of this Recommendation. By not objecting, you may waive the right to appeal questions of fact.

## I. Introduction

Pending before the Court is a § 2254 Petition for a Writ of Habeas Corpus filed by George T. Sullivan ("Sullivan"), an Arkansas Department of Correction ("ADC") inmate. *Doc. 2*. Before addressing Sullivan's habeas claims, the Court will review the procedural history of the case in state court.

1

On August 14, 2014, a Conway County jury convicted Sullivan of second-degree murder. He was sentenced, as a habitual offender, to fifty-five years of imprisonment in the ADC. *Doc. 14-2, Tr. 911, 916.*

Sullivan appealed his conviction to the Arkansas Court of Appeals, which denied his appeal on September 23, 2015 and issued its mandate on October 13, 2015. *Sullivan v. State*, 2015 Ark. App. 514, 470 S.W.3d 312 (*Sullivan I*).

On November 30, 2015, Sullivan filed a *pro se* Rule 37 petition asserting the same ineffective assistance of counsel claims that he is now raising in this federal habeas action. *Doc. 14-14.* Under Ark. R. Crim. P. 37.2(c)(ii), Sullivan's Rule 37 petition was timely because it was filed within sixty days of October 13, 2015, the date the Arkansas Court of Appeals issued the mandate affirming his conviction.

On February 5, 2016, without a hearing or a response from the State, the trial court entered an order holding that the Rule 37 petition was *untimely* because it was filed "sixty-eight (68) days after the issuance of the mandate." This holding was based on the objectively erroneous determination that the Arkansas Court of Appeals issued the mandate in Sullivan's direct appeal on September 23, 2015 – not October 13, 2015. [1] *Doc. 14-6, p. 18.* The trial court, however, then proceeded to analyze

---

[1] A federal habeas court must accept a state court's exercise of discretion in applying state law to conclude that a state post-conviction petition is untimely. *Pace v. DiGugliemo*, 544 U.S. 408, 414 (2005) (If a state court construes state procedural rules or case law, to conclude that a postconviction petition "is untimely under state law . . . [it] is the end of the matter for purposes

and reject all of Sullivan's ineffective assistance of counsel claims, on the merits. *Id. at pp. 19-20.*

On February 22, 2016, Sullivan filed a timely notice of appeal of the trial court's denial of Rule 37 relief, along with a motion to proceed *in forma pauperis*. *Doc. 14-6, pp. 23-24.* The circuit clerk did not prepare or transmit the record to the Arkansas Supreme Court, as required by Ark. R. App. P. Crim. 4(b),[2] and the trial court failed to rule on Sullivan's request to proceed *in forma pauperis* on appeal.

Thereafter, Sullivan made multiple filings, both in the trial court and the Arkansas Supreme Court, in an effort to get the circuit clerk to lodge the record, to extend the time for doing so, and to obtain appellate review of the denial of his Rule 37 petition. He also requested that counsel be appointed to assist him. Those efforts were unsuccessful, and, on March 2, 2017, the Arkansas Supreme Court denied his motions for belated appeal and for rule on the clerk. *Doc. 14-12.*

---

of [assessing statutory tolling under] § 2244(d)(2).") (omitting internal quotations). However, a federal court is not required to accept a state court's *objectively erroneous determination of fact* that it relies on to conclude that a state post-conviction petition is untimely. *See Day v. McDonough,* 547 U.S. 198, 209-10 (2006) (habeas court is not required to "doublecheck the State's math," but "if a judge does detect a clear computation error, no Rule, statute, or constitutional provision commands the judge to suppress that knowledge.").

[2] Under Arkansas's procedural rules, Sullivan had ninety days, or until Monday, May 23, 2016, to file the record with the clerk of the appellate court. *See* Ark. R. App. P. Crim. 4(b).

On May 22, 2017, Sullivan initiated this § 2254 habeas action. In Claims 1 through 14, Sullivan asserts the following ineffective assistance of counsel claims against Michael Allison and Tony Brasuell, his court appointed attorneys who represented him at different times during his criminal case:[3]

Claim 1 -    Mr. Allison failed to subpoena Dr. Randall Rattan and Dr. Lisa Bellah to testify at Sullivan's competency hearing on February 19, 2014;

Claim 2 -    Mr. Allison failed to introduce an October 28, 2013 forensic report as evidence at the February 19, 2014 competency hearing;

Claim 3 -    Mr. Allison failed to "secure a ruling" on a motion to dismiss based on lack of fitness to proceed and lack of mental capacity;

Claim 4A-    Mr. Brasuell failed to obtain a ruling on the motion to dismiss filed by Mr. Allison;

Claim 4B -    Mr. Brasuell failed to obtain a ruling on various other motions, unrelated to Sullivan's alleged lack of mental capacity, which were filed by Mr. Allison;[4]

Claim 5 -    Mr. Brasuell failed to investigate and hire a gun expert, or to call a state crime laboratory witness to testify about the trajectory of the bullets that killed the victim;

---

[3] The trial court initially appointed Michael Allison to represent Sullivan. Following a competency hearing, Sullivan expressed his dissatisfaction with Mr. Allison and requested new counsel. The trial court granted Sullivan's request and appointed Tony Brasuell. Mr. Brasuell entered his appearance on March 7, 2014, and represented Sullivan at trial and on direct appeal.

[4] In Claim 4 of Sullivan's habeas Petition, he asserts a single claim that Mr. Brasuell provided ineffective assistance because he failed "to follow up on and seek a ruling on all of the motions" filed by Mr. Allison. *Doc. 2 p. 8.* The Court has divided Claim 4, as pled by Sullivan, into two subparts: pretrial motions related to Sullivan's mental competency (Claim 4A), and the "other" unrelated pretrial motions (Claim 4B).

Claim 6 -    Mr. Brasuell failed to seek a change of venue;

Claim 7 -    Mr. Brasuell failed to seek a second competency hearing;

Claim 8 -    Mr. Brasuell failed to raise the insanity defense, along with the justification defense, or to call two expert witnesses to testify about Sullivan's mental state;

Claim 9 -    Mr. Brasuell failed to interview Sullivan's co-defendant prior to trial;

Claim 10 -   Mr. Brasuell failed to adequately advise Sullivan of his right to testify;

Claim 11 -   Mr. Brasuell provided "virtually no assistance" to Sullivan during the sentencing phase of his trial;

Claim 12 -   Mr. Brasuell failed to investigate and interview any character witnesses who could have testified during the sentencing phase of his trial;

Claim 13 -   Mr. Brasuell failed to adequately argue for a more lenient sentence; and

Claim 14 -   Mr. Brasuell failed to use a prior inconsistent statement to impeach state witness Josh Hardiman.

*Doc. 2*.

In Claim 15, Sullivan asserts that the trial evidence was insufficient to support his conviction.

In Respondent's Response, she argues that Sullivan's claims should be dismissed because: (1) he initiated this habeas Petition after the expiration of the one year limitations period contained in 28 U.S.C. § 2244(d)(1); (2) the Arkansas Supreme Court's dismissal of his Rule 37 appeal on procedural grounds resulted in him procedurally defaulting all of his ineffective assistance habeas claims; and (3)

all of his habeas claims are without merit.[5]  *Doc. 14.*  Sullivan has filed a Reply.

*Doc. 23.*  Thus, the issues are fully joined and ripe for decision.

For the reasons explained below, the Court concludes that each of Sullivan's

habeas claims is without merit.   Accordingly, it recommends that this case be

dismissed, with prejudice.

## II. Analysis

### A.    All of Sullivan's Habeas Claims Are Governed By AEDPA's[6] Deferential Standard of Review

Both the trial court's rejection of Sullivan's Rule 37 ineffective assistance of

counsel claims and the Arkansas Court of Appeals' rejection of his sufficiency of

the evidence claim are entitled to deferential review under 28 U.S.C. § 2254(d).[7]

---

[5]  The Court's preliminary review of the limitations issue suggests that, after excluding all the applicable periods of statutory and equitable tolling, Sullivan may have initiated the action on the last day of the one year limitations period, making his Petition timely.  Similarly, it appears there may be arguments arising from procedural errors committed by others, all of which were outside Sullivan's control, that may excuse his procedural default and allow the Court to reach the merits  of his habeas claims.  Rather than trying to untangle those tightly wound birds nests, the Court concludes it is more efficient to analyze Sullivan's habeas claims on the merits.  *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.");  *Trussell v. Bowersox,* 447 F.3d 588, 590–91 (8th Cir. 2006) (because neither the statute of limitations nor procedural default presents a jurisdictional bar to federal habeas review, both issues can be bypassed "in the interest of judicial economy");  *McKinnon v. Lockhart*, 921 F.2d 830, 833 n.7 (8th Cir. 1990) (*per curiam*) ("Where it is more efficient to do so . . . this Court may resolve [habeas] claims on the merits rather than navigating through a procedural-default thicket.").

[6] Antiterrorism and Effective Death Penalty Act of 1996.

[7] In denying all of Sullivan's Rule 37 claims, on the merits, the trial court did not analyze Claims 5 and 9.  Nevertheless, § 2254(d) still governs those claims.  *Harrington v. Richter*, 562

*Rolan v. Coleman*, 680 F.3d 311, 321 (3rd Cir. 2012) ("[A]fter considering our sister circuits' analyses alongside the Supreme Court's articulation in *Harris* [*v. Reed*, 489 U.S. 255 (1989)], we will apply AEDPA deference to the Superior Court's alternative holding on the merits of Rolan's claim."); *Brooks v. Bagley*, 513 F.3d 618, 624-25 (6th Cir. 2008) ("[W]e must consider whether the court's alternative merits ruling receives AEDPA deference. We think that it does. The language of the statute does not draw a distinction between cases involving alternative rulings; it refers broadly to any claim that was adjudicated on the merits in State court proceedings.") (internal quotation marks and citation omitted)); *Jimenez v. Walker*, 458 F.3d 130 (2nd Cir. 2006).

Under § 2254(d)'s onerous standard of review, a federal court may not grant habeas relief unless the decision by the state court "was contrary to, or involved an unreasonable application of, clearly established federal law" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2).

---

U.S. 86, 98 (2011) (Section 2254(d)'s deferential standard applies even "when a state court's order denying relief is unaccompanied by an opinion explaining the reasons relief has been denied."). In evaluating the trial court's rejection of Claims 5 and 9, this Court must determine, from its review of the entire record, what arguments or theories "could have supported" the trial court's decision and then ask "whether it is possible fair-minded jurists could disagree that those arguments or theories are inconsistent" with the governing Supreme Court law. *Id. at 102.* In the context of an ineffective-assistance claim, the question is "whether there is any reasonable argument" that defense counsel met the standard established by *Strickland v. Washington*, 466 U.S. 668 (1984) for constitutionally effective assistance of counsel. *Id. at 105.*

A state court decision is "contrary to" clearly established federal law if it reaches a conclusion opposite that of the Supreme Court on a question of law, or reaches a decision contrary to the Supreme Court on materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). A state court decision involves an "unreasonable application" of federal law when it identifies the correct legal rule, but unreasonably applies it to the facts. *Id.* at 407. "A state court's application of clearly established federal law must be objectively unreasonable, not merely incorrect, to warrant the granting of a writ of habeas corpus." *Jackson v. Norris*, 651 F.3d 923, 925 (8th Cir. 2011). Finally, a state court's findings of fact are presumptively correct, and the habeas petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." *Stenhouse v. Hobbs*, 631 F.3d 888, 891 (8th Cir. 2011) (quoting 28 U.S.C. § 2254(e)(1)).

## B.    Claim 15 - Insufficiency of the Evidence[8]

Sullivan contends the "evidence is insufficient to support his second-degree murder conviction." *Doc. 2, p. 20.* Other than this conclusory assertion, Sullivan provides no further support for the claim.

---

[8] The Court has analyzed this claim first to provide an overview of the evidence supporting Sullivan's conviction and a framework for analyzing his remaining claims challenging his trial counsel's effectiveness.

8

In resolving a § 2254 insufficiency of the evidence claim, a federal court is required to view the evidence presented during the habeas petitioner's trial in the light most favorable to the prosecution, and then decide if any rational trier of fact could have found from that evidence the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

On direct appeal, the Arkansas Court of Appeals began its discussion of this claim by reviewing the facts:

> Morrilton police officers were called to 206 North Hills during the afternoon of January 28, 2013. There, they found the body of Eric Criswell, who had been shot in the chest and left buttock, lying in the doorway to the residence. While officers were securing the scene, they discovered eight spent .45–caliber hulls between the porch and the driveway. The points of impact of the bullets were primarily located around the porch, and none impacted above the door-handle level.
>
> After interviewing witnesses, officers apprehended appellant as a suspect. He then gave a statement. Appellant informed police that earlier in the day he and Richard Palma had purchased fraudulent drugs from Criswell's girlfriend, Charity King. Palma, who provided the gun, drove appellant to Criswell's house to confront King, and began circling the block. After appellant knocked on the door, Criswell and his friend, Josh Hardiman, came outside. He stated that, after talking for a moment, Criswell went back inside and slammed the door in his face. Criswell then came back outside, and the two began arguing with each other. Soon thereafter, appellant alleges that Criswell, a much bigger man, lunged at him with one hand apparently behind his back, as if to conceal a weapon, and he "blacked out," firing eight warning shots. One of those shots struck Criswell in the middle of the chest. Criswell said, "Are you serious?" and moved toward his door. Appellant left with Palma.
>
> On August 11, 2014, in addition to the testimony of multiple witnesses, appellant's recorded statement was played for the jury. At the end of

the State's case-in-chief, appellant moved for a directed verdict, asserting justification as a defense for his use of deadly force. His motion was denied.

*Sullivan I*, 2015 Ark. App. 514, 1-2, 470 S.W.3d at 314.

The Court next addressed Sullivan's argument that the trial evidence would not support his conviction for second degree murder, because his actions did not satisfy the essential element of "knowingly" causing the death of another person "under circumstances manifesting extreme indifference to the value of human life":

> [Sullivan] sets forth four reasons in arguing that the State did not prove that he knowingly caused the death of Eric Criswell, or alternatively, that he was justified in doing so. First, he argues that the evidence at the crime scene shows that he was backing up while firing. Second, no bullets were fired above the level of the door handle. Third, there was no blood found in front of the house or on the porch, and therefore, he did not know Criswell was shot. Fourth, Criswell's comment "are you serious?" was not indicative of a person who had been shot.

> A jury could find that [Sullivan's] arguments and his defense of justification are without merit. [Sullivan] intentionally fired eight "warning shots" at Criswell. Two struck Criswell, including a fatal shot to the center of his chest. The jury found that such conduct established extreme indifference to human life. [Sullivan's] argument that the fact that the bullets were fired below the door handle is indicative that he was without intent was also found to be meritless. First, the simple act of pointing a loaded gun at Criswell was enough to satisfy the intent standard of second-degree murder.  Second, evidence showed that at least one shot was fired above the door handle as it struck Criswell, a tall man, in the center of his chest. Third, appellant is incorrect in his assertion that one could not reasonably anticipate the death of a victim solely because shots were fired below the waist.

> [Sullivan] also was not justified in using such force against Criswell. Primarily, [Sullivan] initiated the situation that brought about his use of deadly force. He arrived at Criswell's home with a loaded gun and when Criswell went back inside, appellant remained. Further, evidence at the

crime scene did not support appellant's assertion that he was backing up when firing shots. Finally, Josh Hardiman, an eyewitness, testified that Criswell never "charged" at the appellant; that he never left the porch. Even if appellant's statements are accurate, a jury could find that firing eight shots in the direction of a person lunging at him was unreasonable.

We affirm.

*Sullivan I*, 2015 Ark. App. 514, 4-5, 470 S.W.3d at 315-16 (omitting footnotes).

Claims challenging the sufficiency of the trial evidence "face a high bar in federal habeas proceedings." *Coleman v. Johnson,* 566 U.S. 650, 651 (2012).  "[I]t is the responsibility of the jury - not the [reviewing] court - to decide what conclusions should be drawn from evidence admitted at trial."  *Id.*  Evidence is sufficient to support a conviction whenever, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Id.* at 654 (quoting *Jackson v. Virginia,* 443 U.S. 307, 319 (1979)).  Circumstantial evidence is "just as probative as any other type of evidence."  *Garrison v. Burt,* 637 F.3d 849, 855 (8th Cir. 2011); *see also Holland v. United States,* 348 U.S. 121, 140 (1954) (circumstantial evidence is "intrinsically no different from testimonial evidence," and "[i]f the jury is convinced beyond a reasonable doubt, we can require no more").

The evidence was more than sufficient to support the jury's conclusion that Sullivan committed second degree murder when he:  (1) went to Criswell's home armed with a .45 pistol; (2) confronted Criswell and demanded money for the "bad

drugs" he purchased from Criswell's girlfriend; (3) refused to leave after Criswell retreated into his house; and (4) fired eight shots at Criswell, who was unarmed, when Criswell opened the door again.  This undisputed evidence amply supported the jury's conclusion that Sullivan acted under circumstances manifesting extreme indifference to human life, the prerequisite to support a second-degree murder conviction.  *See Price v. State*, 347 Ark. 708, 719-20, 66 S.W.3d 653, 659 (2002) ("the mere act of pointing a gun at another person in the course of a robbery is a manifestation of extreme indifference to the value of human life").

Similarly, the evidence strongly supported the jury's rejection of Sullivan's justification defense.  Under Arkansas law, Sullivan was only justified in using deadly physical force on Criswell *if* Sullivan "reasonably believe[d]" that Criswell was "using or about to use unlawful deadly physical force" *and* Sullivan could not "avoid the necessity of using deadly physical force . . . [b]y retreating."  Ark. Code Ann. §§ 5-2-607(a)(1); 5-2-607(b)(1)(A).  In his statement to police, Sullivan stated that he felt threatened by Criswell but failed to explain *why*, given the fact Criswell was unarmed and Sullivan had a loaded .45 caliber pistol.  Finally, at any point during the confrontation, Sullivan could have "avoid[ed] the necessity of using deadly physical force [against Criswell] . . . [b]y retreating."

There is simply no basis for concluding that the Arkansas Court of Appeals' rejection of Sullivan's sufficiency of the evidence claim was either: (1) contrary to,

12

or involved an unreasonable application of established federal law;  or (2) based on an unreasonable determination of the facts in light of the trial evidence.  Thus, Claim 15 is without merit and should be dismissed.

### C.    Sullivan's Ineffective Assistance of Trial Counsel Claims

#### 1.    Claims Related to Sullivan's Mental Competency (Claims 1-3; 4A; 7-8)

These six claims all relate to Mr. Allison's and Mr. Brasuell's alleged failures to present both the threshold issue of Sullivan's fitness to stand trial and the affirmative defense that he suffered from a mental disease or defect at the time of the alleged offense which prevented him forming the *mens rea* necessary for legal guilt.[9]

Claims 1 through 3 relate to Sullivan's contention that Mr. Allison provided constitutionally inadequate performance at Sullivan's February 19, 2014 competency hearing by: (1) failing to have Dr. Randall Rattan and Dr. Lisa Bellah testify;  (2)  failing to introduce into evidence Dr. Rattan's forensic report, dated

---

[9] Sullivan's "fitness to stand trial" and his lack of the requisite *mens rea* are separate and distinct legal issues.  *See* Ark. Code Ann. § 5-2-302 (2013 Repl.) ("No person who lacks the capacity to understand a proceeding against him . . . or to assist effectively in his . . . own defense as a result of mental disease or defect shall be tried, convicted, or sentenced for the commission of the offense so long as the incapacity endures.");  Ark. Code Ann. § 5-2-312(a) (2013 Repl.) (describing the requirements of the affirmative defense of lack of capacity as a result of mental disease or defect to conform his conduct to the requirements of law or to appreciate the criminality of his conduct).  However, the resolution of both of those issues turns on Sullivan's "mental competency:" first, at the time he killed Criswell;  and, second, during the time leading up to and including his criminal trial.

13

October 28, 2013; and (3) failing to "secure a ruling" on the motion to dismiss the murder charge based on lack of mental competency.

In Claim 4A, Sullivan asserts that, after Mr. Brasuell began representing him, he was constitutionally ineffective because he also failed to obtain a ruling on the motion to dismiss filed by Mr. Allison. In Claims 7 and 8, Sullivan asserts that Mr. Brasuell provided constitutionally inadequate assistance of counsel by: (1) failing to request a second competency hearing; and (2) failing to present a lack of capacity defense at trial.

### a. Sullivan's Three Mental Evaluations and Competency Hearing Prior To The Trial

On February 27, 2013, one week after Mr. Allison was appointed to represent Sullivan, the trial court ordered Sullivan to have a mental evaluation at the Arkansas State Hospital ("ASH"). *Doc. 14-2*, *Tr. 5-6, 22-23*.

On July 8, 2013, Lacey Willett, Psy.D and Mark Peacock, Ph.D, submitted a Forensic Report which found that Sullivan: (1) was fit to proceed to trial; (2) was not suffering from a mental disease or defect at the time of the charged conduct; and (3) possessed the capacity to appreciate the criminality of his conduct at the time of the charged offense. *Doc. 14-2*, *Tr. 33-57* ("ASH Evaluation"). They diagnosed Sullivan with:

> Axis I:    Malingering
>            Amphetamine Dependence, in a controlled environment
>            Cannabis Abuse, in a controlled environment

| Axis II: | Antisocial Personality Disorder |
| | Borderline Personality Disorder |

*Id. at 51*.

Drs. Willett and Peacock concluded that Sullivan was malingering because "his score on this measure was more than two times higher than the cut score that distinguishes between honest responders and malingers." According to them, this was "indicative of feigned psychopathology." *Id*.

Between September 5 and October 28, 2013, Sullivan had a second mental evaluation, conducted at the Federal Bureau of Prisons ("BOP"). This evaluation was ordered in connection with unrelated federal gun charges pending against Sullivan.[10]    Federal Psychological Evaluation, *Doc. 14-2, Tr. 77-86* ("BOP Evaluation").    The BOP Evaluation, signed by Randall Rattan, Ph.D. and Lisa Bellah, Ph.D., diagnosed Sullivan with:

| Axis I: | Major Depressive Disorder, Recurrent, Severe, With |
| | Psychotic Features |
| | Cannabis Abuse |
| | Alcohol Abuse |
| | Rule Out Schizoaffective Disorder |
| | Rule Out Cocaine Abuse |
| Axis II: | Borderline Intellectual Functioning |
| | Antisocial Personality Disorder |

_____

[10] On February 6, 2013, Sullivan was indicted on federal charges related to his alleged possession of a shotgun on October 23, 2012. *United States v. Sullivan*, E.D. Arkansas Case No. 4:13-cr-00042-KGB. Sullivan was already in state custody on the Conway County murder charge when he made his initial appearance in the federal case.

15

Borderline Personality Disorder

*Id. at 84*.  The BOP Evaluation concluded that Sullivan "appeared to suffer from a mental disease or defect rendering him unable to understand the nature and consequences of the proceedings against him or to properly assist in his defense." *Id. at 85*.[11]

In reaching this conclusion, Drs. Rattan and Bellah did *not* administer the Evaluation of Competence to Stand Trial (ECST-R) because Sullivan was "placed late in the study period on Suicide Watch due to reported depressive and psychotic symptoms" and "various clinical and administrative difficulties associated with conducting this interview in this setting and in this clinical condition."  *Doc. 14-2, Tr. 84*.  This meant the BOP Evaluation did *not* administer the most appropriate test for determining if he was malingering, *i.e.*, "feigning psychopathology."  In contrast,

---

[11]  The BOP Evaluation recommended that Sullivan be referred to a medical facility, finding that a "substantial probability" existed that Sullivan would be "restored to competency in the foreseeable future." *Id. at 85-86*.  Because of this finding, the BOP Evaluation did *not* address Sullivan's mental capacity at the time of the charged offense.

Ultimately, on October 9, 2014, the federal criminal charges were dismissed at the request of the United States.  *United States v. Sullivan*, E.D. Ark. Case No. 4:13-CR-00042-KGB, *Docs. 30-31*.  The dismissal followed two agreed motions for continuance during which it was stated that "because Mr. Sullivan is in state custody it is not possible to attempt to restore him to competency at this time." *Id. at Docs. 26, 28*.

Thus, Sullivan's assertion in his habeas papers that he was *acquitted* of federal gun charges in 2014, because of mental disease, is false.  *Doc. 2, p. 11*.

16

after administering Sullivan the ECST-R, and conducting a standardized interview,

Drs. Willett and Peacock concluded that Sullivan was "feign[ing]" incompetency:

> The ECST-R also contains an Atypical Presentation scale that screens
> for feigned incompetency. Results of the validity scales indicated that
> Mr. Sullivan attempted to feign both non-psychotic and psychotic
> problems with regard to competency. In fact, his score indicating the
> feigning of non-psychotic symptoms fell at the ≥99th percentile, as did
> his score indicating the feigning of psychotic problems. This attempt
> at feigning incompetence is consistent with his attempts to feign
> psychopathology and impairment on other assessment measures as
> discussed above.

*Id. at 53-54*.

On December 31, 2013, Mr. Allison, relying on the BOP Evaluation, filed a

motion to dismiss the state court murder charge against Sullivan. In his motion, Mr.

Allison argued that Sullivan: (1) was not capable of assisting with his defense; and

(2) lacked the mental capacity to possess the requisite mental state for the charged

offense. *Doc. 14-2, Tr. 74-76*.

On February 19, 2014, the trial court conducted a competency hearing to

address the matters raised in the motion to dismiss. *Doc. 14-2*, *Tr. 94-119*. The

State called Dr. Willett, a forensic psychologist and assistant professor at the ASH

and University of Arkansas for Medical Sciences. Dr. Willett testified that she

prepared the ASH Evaluation after conducting a forensic evaluation of Sullivan on

May 28, 2018. *Id. at 98-99*. She explained that Sullivan "scored off the charts with

a greater than 99 percentile ranking" on a test to assess whether he was trying to

feign mental illness. Sullivan's performance on this test, which was "as bad as he possibly could" score, convinced her that he was trying to make her think he was incompetent. *Id. at 112-113.*

On cross-examination, Mr. Allison questioned Dr. Willett about the Federal Evaluation. Dr. Willett stated that she "wasn't very impressed with the evaluation procedure" and, in her view, the opinion that Sullivan was not competent to defend against the federal charges was not supported with sufficient factual evidence. *Id. at 110-11.*

After Dr. Willett's testimony, Mr. Allison did not call any witnesses. Ruling from the bench, the trial court held that: (1) based on the evidence and testimony before it and . . . State's Exhibit 1 [the ASH Evaluation], the Court's going to find that the defendant is competent and able to proceed to trial; (2) "at the time of the examination Mr. Sullivan did not manifest . . . [symptoms] of a mental disease or mental defect"; (3) "at the time of the alleged offense, Mr. Sullivan did not have a mental disease or defect"; (4) "Mr. Sullivan's state of mind surrounding the time of the alleged offense was not of such a nature as to render him incapable of conforming his conduct to the requirements of the law; and (5) "Mr. Sullivan was capable of forming the necessary mental state required as an element [] of the offense." *Id. at 113- 114.*

18

Mr. Allison then asked the trial judge to "withhold" a formal ruling on the motion until he could talk to Sullivan's defense counsel in the federal case to "see if they're going to do anything." The trial judge agreed, but stated that, if his ruling on the motion was not revisited before the trial started, it would be deemed final. Mr. Allison agreed. *Id. at 115-16.*

The competency issue was *not* raised again in Sullivan's state court trial. However, after Mr. Brasuell was appointed to represent Sullivan, he retained Dr. J. Michael Wood to conduct a third forensic examination. After examining Sullivan on June 16, 2014 and August 2, 2014, Dr. Wood prepared a "Forensic Evaluation Working Notes/Draft" ("Dr. Wood's Evaluation"). *Doc. 2, pp. 9, 23-46.* Based on his review of the two earlier evaluations, an eight-hour interview of Sullivan, the administration of a battery of tests, and the review of Sullivan's prior medical records, Dr. Wood concluded:

1. Mr. Sullivan at the time of the examination had the capacity to understand the proceedings against him and the capacity to assist effectively in his own defense.

2. At the time of the examination he had mental disease, but did not have mental defect.

His diagnosis was:
Unspecified Bipolar Disorder and related disorder
Rule-out Schizoaffective Disorder, Bipolar Type
Unspecified Schizophrenia Spectrum and Other Psychotic
Disorder
Antisocial Personality Disorder
Borderline Personality Traits

19

Borderline Intellectual Functioning
Amphetamine Use Disorder, In a Controlled Environment
Cannabis Use Disorder, In a Controlled Environment

3.      At the time of the alleged conduct, should the fact finder conclude that he committed the charges offenses:

1.      Mr. Sullivan had mental disease, but did not have mental defect.
2.      Despite mental disease, he did not lack the capacity to appreciate the criminality of his conduct.
3.      He did not lack the capacity to conform his conduct to the requirements of the law.

*Id.* at 23-24.

**b.      The Trial Court's Rejection of Sullivan's Rule 37 Mental Competency Claims**

In support of its Rule 37 decision rejecting Claims 1, 2, 3, 4A, 7 and 8, on the

merits, the trial court stated the following:

A thorough competency hearing was conducted on February 19, 2014. During the competency hearing, testimony was received from Dr. Lacey Willett, Psy.D. which included testimony regarding the evaluation performed by Dr. Willett and the difference between her evaluation and the one conducted by Dr. Rattan and Dr. Bellah. The evaluation of Dr. Rattan and Dr. Bellah was attached to the Motion to Dismiss filed by Mr. Allison. It is clear that the evaluation of Dr. Rattan and Dr. Bellah would not change the ruling of the Court regarding the issue of competency. Most of the measures attempted to be administered by Dr. Rattan and Dr. Bellah in the federal evaluation were invalidated and there was no competency measure administered by them. In addition, Dr. Willett's testimony regarding malingering by the Defendant was a particular consideration by the Court. In her testimony, Dr. Willett stated that "The cut score is six (6), which means if they score higher than six (6) that's indicative of malingering, and he scored sixteen (16)." Dr. Willett's complete Forensic Report is set forth as State's Exhibit #1 from the competency hearing. Due to the Court's

Case 5:17-cv-00147-JLH   Document 32   Filed 11/30/18   Page 21 of 41

finding of competency to proceed at the conclusion of the hearing, the
Defendant's Motion to Dismiss became a moot issue.

*Doc. 14-6, p. 19* (omitting citations to Record); *see also Id. at 20* (rejecting argument

that Mr. Brasuell was ineffective for failing to raise the insanity defense at trial). [12]

The record makes it clear that questions related to Sullivan's mental

competency were thoroughly explored *before* his murder trial began.  Sullivan was

subjected to three separate mental evaluations conducted by different mental health

professionals - - one at the request of each of his trial counsel and another in

connection with pending federal charges.  The trial court, after considering the ASH

and BOP Evaluations, concluded that Sullivan was both fit to stand trial and had the

capacity to appreciate the criminality of his conduct when he murdered Criswell.

The evaluation by Dr. Wood, while not considered by the trial court, removed any

basis to challenge either Sullivan's fitness to proceed or lack of mental capacity at

the time of the alleged offense.

---

[12]  Although the trial court's order denying post-conviction relief does not cite *Strickland*
or other federal case law, it clearly was applying *Strickland* in assessing whether Sullivan had met
his burden to prove that "his defense was prejudiced to a significant degree by his counsel's
performance" and to demonstrate "a reasonable probability that, but for counsel's error, the fact-
finder would have had a reasonable doubt respecting guilt.'  *Doc. 14-6 p. 21*.  To be entitled to §
2254(d) deference, the state court's decision need not cite controlling Supreme Court precedent,
"so long as neither the reasoning nor the result" contradicts the governing precedent. *Mitchell v.
Esparza*, 540 U.S. 12, 16 (2003).

Sullivan makes the factually unsupportable argument that Dr. Wood's Evaluation "directly contradicts" the ASH Evaluation. *Doc. 2 p. 9.* In fact, it was Dr. Wood's opinion that Sullivan was *competent* to stand trial and that he *understood* the criminal nature of his conduct when he killed Criswell. As a result, Mr. Brasuell had no good-faith basis to ask the trial court to revisit its earlier rulings that Sullivan: (1) was competent to proceed to trial; (2) was not suffering from a mental disease or defect at the time he committed the offense conduct; and (3) had the mental capacity to form the mental state necessary to commit murder. Dr. Wood's opinions, which were *consistent with* and *supported* the trial court's mental competency rulings, eliminated any basis for Mr. Brasuell to attempt to pursue "lack of mental capacity" as an affirmative defense.

Sullivan's habeas filings fail to provide any factual support for his six claims related to his alleged lack of mental competency. First, Mr. Allison was not "ineffective" for failing to call Drs. Rattan and Bellah to testify during the competency hearing. Had they been called to testify, their admitted failure to perform the ECST-R,[13] a standardized evaluation to screen for *feigned psychopathology*, would have rendered their testimony of little to no benefit. Second, neither Mr. Allison nor Mr. Brasuell performed ineffectively because they

---

[13] *See* footnote 11, *supra* (discussing ECST-R).

did not request a second competency hearing or attempt to convince the trial court to change the mental capacity rulings it made in denying Sullivan's motion to dismiss the murder charge. Finally, Mr. Brasuell wisely elected *not* to pursue the affirmative defense of lack of mental capacity at trial.[14] If he had attempted to do so, it would have *weakened* Sullivan's justification defense because those two defenses are *inconsistent*. This decision by Mr. Brasuell appears to have paid off, because the jury convicted Sullivan of the lesser-included offense of second-degree murder, instead of the first-degree murder conviction sought by the State.

The trial court's Rule 37 decision to reject Claims 1, 2, 3, 4A, 7, and 8 was not based on either "an unreasonable application" of "clearly established Federal law," or "an unreasonable determination of the facts" based on the evidence presented at trial. 28 U.S.C. § 2254(d)(1) & (2). Thus, these ineffective assistance of counsel claims are without merit and should be dismissed.

### 2. Trial Counsel's Failure to Obtain a Ruling on Pretrial Motions Unrelated to Mental Competency (Claim 4B)

In Claim 4B, Sullivan argues that Mr. Brasuell provided constitutionally ineffective counsel by failing to obtain a ruling on pretrial motions filed by Mr.

---

[14] Simply put, there was *no factual basis* to support such a defense. Of the three mental evaluations conducted, only two addressed Sullivan's mental capacity at the time of the alleged offense. Both of those evaluations, the ASH Evaluation and Dr. Wood's Evaluation, concluded that, when Sullivan shot Criswell, he had the requisite mental capacity to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law.

Allison that were *unrelated* to the mental competency issues addressed and resolved during the February 19, 2014 hearing.  *Doc. 2, p. 8.*

In its Rule 37 decision, the trial court rejected this claim for the reasons that it gave in addressing "defense motions and various other issues . . . on August 6, 2014."[15]  *Doc. 14-6, p. 20.*

Sullivan identifies only two motions, unrelated to mental competency, that Mr. Brasuell allegedly failed to get a ruling on: (1) a motion to suppress statement/confession; and (2)  a notice of intent to cross-examine crime laboratory witnesses.  *Doc. 14-2, Tr. 65-67.*  Neither of these issues was addressed during the August 6, 2014 pretrial hearing, during which the trial court resolved several pending defense motions.  *Doc. 14-2, Tr. 218-234* (Hearing Transcript).

As to Sullivan's interview with police, which was videotaped, he fails to identify *any* legal argument that Mr. Brasuell could have made that would have resulted in the suppression of Sullivan's videotaped statement.  Before giving this statement, Sullivan signed a Miranda Rights Form fully advising him of his legal rights.  According to the form, Sullivan agreed that he had been read his rights,

---

[15]  No issues were raised regarding Sullivan's mental competency during this pretrial hearing, which was held shortly before trial.  During the hearing, the trial court rule on motions by Mr. Brasuell to exclude irrelevant portions of Sullivan's statement to police and to exclude evidence of prior police dealings with Sullivan.  Both motions were resolved by agreement.  *Doc. 14-2, Tr. 220-224.*  In addition, Mr. Brasuell put of record the fact that Sullivan had rejected a plea offer, a decision Mr. Brasuell stated he believed had been "intelligently made."  *Id. at 226.*

understood them, was "willing to make a statement and answer questions," and that "[n]o promises or threats [had] been made" to force him to give his voluntary statement. *Doc. 14-2, Tr. 880* (Miranda Rights Form).

Mr. Brasuell followed up on Mr. Allison's motion to suppress the statement Sullivan gave to police by filing his own motion requesting a hearing on the statement's admissibility. *Doc. 14-2, Tr. 182-183* (Mr. Brasuell's motion); *Id. at 65-66* (Mr. Allison's motion). It appears, however, that after he realized there was no legal or factual basis for him to do so, he did not press for a hearing on the issue or a ruling on the motion filed by Mr. Allison. If Mr. Brasuell had done so, the trial court would have denied the motion because the record makes it clear that Sullivan gave a knowing and voluntary statement to the police after he had made a proper waiver of his Fifth Amendment rights under *Miranda*.

As to the "notice of intent," it initially was filed by Mr. Allison to notify the State that the defense intended to cross-examine employees of the Arkansas State Crime Laboratory. *See* Ark. Code Ann. § 12-12-313 (requiring defendants to give notice of intent to cross-examine to procure the attendance at trial of any analyst preparing a report for the State Crime Laboratory). After he was appointed to represent Sullivan, Mr. Brasuell filed his own "notice of intent" to ensure these witnesses appeared at trial. *Doc. 14-2 Tr. 192*. Sullivan fails to identify *any* crime laboratory employee who was *not* present at trial or to explain what he believes Mr.

Brasuell could or should have done in this regard that constitutes ineffective assistance of counsel.

With regard to Claim 4B, Sullivan has made only conclusory allegations of alleged ineffectiveness by Mr. Brasuell and Mr. Allison, none of which are supported by any facts in the record. Thus, Sullivan has failed to demonstrate either the performance or prejudice prongs of *Strickland*, both of which are required to prove ineffective assistance of counsel. *See Burt v. Titlow*, 134 S. Ct. 10, 17 (2013) (under *Strickland*, counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment," with the burden to show otherwise "rest[ing] squarely on the defendant"); *Wong v. Belmontes,* 558 U.S. 15, 27 (2009) ("*Strickland* places the burden on the defendant, not the State, to show a 'reasonable probability' that the result would have been different.").

The trial court's Rule 37 decision to reject Claim 4B was not based on either "an unreasonable application" of "clearly established Federal law," or "an unreasonable determination of the facts" based on the evidence presented at trial. Thus, Claim 4B is without merit and should be dismissed.

### 3.    Counsel's Failure to Hire a Gun Expert or to Call a Witness on Bullet Trajectory (Claim 5)

Sullivan contends that Mr. Brasuell was constitutionally ineffective for failing: (1) to hire a gun expert to offer testimony on the pattern of the eight .45

26

caliber shells recovered at the scene: and (2) to call any witnesses from the state crime laboratory to testify about the trajectory of the bullets. *Doc. 2, p. 8.* The trial court did not specifically address this claim in denying post-conviction relief.

At trial, Sullivan pursued a justification defense. Since he admitted shooting Criswell and multiple eyewitnesses identified him as the shooter, this was his only viable defense.[16] In his statement to police, Sullivan stated he began firing his .45 caliber pistol at Criswell from a distance of five or six feet. *Doc. 14-2, Tr. 660-61.* The medical examiner, Dr. Kokes, testified that Mr. Criswell's death was caused by a bullet that entered his chest, tore through his heart and liver, and caused internal bleeding. *Doc. 14-2, Tr. 560-61.*

Mark Brice, a special agent with the Arkansas State Police, testified that he recovered eight .45 caliber bullet casings from the scene. He also prepared a diagram of where the shell casings were located. *Doc. 14-2, Tr. 593-599.* However, he testified there was no way to determine, based on the location of the shell casings, the order in which the bullets were fired. He also could not determine where Criswell was standing when the bullets entered his body. *Id. at 662-63.*

In closing argument, Mr. Brasuell argued, based on the pattern of the shell casings, which were scattered from the porch to the driveway, that Sullivan "panic

---

[16] As previously discussed, Sullivan's trial counsel had no factual or legal basis for pursuing an affirmative defense of lack of mental capacity.

27

fired" and shot Mr. Criswell while retreating.  *Id*. at 714-715.  This argument directly supported Sullivan's justification defense.

Sullivan fails to identify what other testimony Mr. Brasuell could have presented on the pattern of the shell casings or the trajectory of the bullets.  With only Sullivan's vague allegations to support this claim, it is impossible to know what Mr. Brasuell did or failed to do that allegedly fell below the threshold for constitutionally acceptable representation, much less allow the Court to evaluate the merits of the claim.  *Armstrong v. Kemna*, 534 F.3d 857, 867–68 (8th Cir. 2008) (quoting *Harrison v. Quarterman*, 496 F.3d 419, 428 (5th Cir. 2007) ("Ordinarily, a defendant's failure to present some evidence from the uncalled witness regarding that witness's potential testimony . . . would be fatal to an ineffective assistance of counsel claim.")); *see also Williams v. Armontrout*, 912 F.2d 924, 934 (8th Cir. 1990) ("Decisions relating to witness selection are normally left to counsel's judgment and this judgment [should not] be second guessed on hindsight.").

Sullivan's failure to identify the testimony that allegedly could and should have been offered makes it impossible for him to meet his burden of showing that, had such testimony been presented, there is a "reasonable probability" that "the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694; *Armstrong*, 590 F.3d at 595-96.  Thus, Sullivan has failed to demonstrate that he suffered any prejudice.

The trial court's Rule 37 decision to reject Claim 5 was not based on either "an unreasonable application" of "clearly established Federal law," or "an unreasonable determination of the facts" based on the evidence presented at trial. Thus, Claim 5 is without merit and should be dismissed.

### 4.   Counsel's Failure to Seek a Change of Venue (Claim 6)

Sullivan argues that both of his defense attorneys were constitutionally ineffective for not seeking a change of venue.  His sole support for this claim is his allegation that several Conway County residents allegedly signed affidavits , on July 29, 2014, stating:

> I am aware of the murder charge against George Sullivan.  I am aware of the publicity it has received, as well as the discussions within the community.  I am not related to George Sullivan in any way.  In my opinion, the minds of the inhabitants of Conway County are so prejudiced against George Sullivan that a fair and impartial trial cannot be had in Conway County.

*Doc. 2, p. 9.*  However, there are no such affidavits anywhere in the state trial court record;  Sullivan did not file them in this federal habeas action;  and he has failed to offer any explanation of *why* there is *no evidence* to support the existence of such affidavits.

In its Rule 37 decision, the trial court rejected this claim for the following reasons:

> Jury selection in the present matter proceeded through the natural process.  There is no allegation or indication that any of the chosen jurors were not fair or impartial.  Additionally, both the State of

29

Arkansas and the Defendant informed the Court that the jury was satisfactory prior to release of the remaining jury panel. The allegation of the Defendant is merely a conclusion and is not supported by any facts, affidavits, newspaper reports, or statements of Conway County, Arkansas residents. As such, the Defendant has failed to demonstrate, in any manner that there was countywide prejudice against him or that he could not receive a fair trial in Conway County, Arkansas. The change of venue allegation by the Defendant is without merit.

Order denying Rule 37.1 petition, *Doc. 14-6, p. 20, ¶ 13* (omitting citations).

There is no evidence in the record that any members of the venire panel or jury were biased against Sullivan, much less that the nature and circumstances of the charges against him might support a motion for change of venue. Similarly, Sullivan has come forward with nothing to suggest that either the jury panel or any individual juror negatively impacted the outcome of the trial. While the United States Supreme Court has recognized that prejudice may be presumed where the jury pool is tainted "by so huge a wave of public passion that the impaneling of an impartial jury is impossible,"[17] Sullivan makes nothing approaching such a showing in this case.

The trial court's Rule 37 decision to reject Claim 6 was not based on either "an unreasonable application" of "clearly established Federal law," or "an

---

[17] *Irvin v. Dowd*, 366 U.S. 717, 728 (1961); *see also Rideau v. Louisiana*, 373 U.S. 723 (1963) (due process violation after defendant's filmed confession was repeatedly broadcast on the local television news of the small town); *Estes v. Texas*, 381 U.S. 532, 545-51, (1965) (presuming prejudice based on pretrial and trial media coverage that resulted in a "circus" atmosphere that deprived the defendant of a fair trial).

unreasonable determination of the facts" based on the evidence presented at trial. Thus, Claim 6 is without merit and should be dismissed.

### 5. Counsel's Failure to Interview Co-Defendant Richard Palma (Claim 9)

Sullivan asserts that Mr. Brasuell's failure to interview his co-defendant, Richard Palma, before trial constituted ineffective assistance of counsel because it prevented him from conducting an effective cross-examination. *Doc. 2, p. 13*. In its Rule 37 decision, the trial court rejected this claim, without specifically discussing it.

While Sullivan alleges that Mr. Brasuell had "no idea what Palma would testify to" at trial, he,[18] he does not go on to identify the testimony Mr. Brasuell should have elicited from Palma that would have helped his defense. *Doc. 14-14, p. 6, ¶ 12*. Thus, it is impossible to meaningfully evaluate Sullivan's conclusory and speculative claim that Mr. Brasuell was ineffective in cross-examining Palma.[19]

Before testifying against Sullivan, Palma pleaded guilty to second degree murder and received a twenty-year sentence. His plea deal required him to testify against Sullivan. Palma testified that earlier on the day of the murder, he and

---

[18] Since there was no Rule 37 hearing, it is unknown whether Mr. Brasuell interviewed Palma before trial.

[19] Palma drove Sullivan to and from Criswell's home and knew Sullivan had a gun. As a result, Palma was also charged in Criswell's death.

Sullivan had been hanging out doing drugs together and he gave Sullivan a .45 caliber pistol in exchange for crystal methamphetamine.  Later that day, Palma gave Sullivan $80 to buy oxycontin pills for him.  The transaction took place in a parking lot, with Palma waiting in his car and Sullivan going to another car to purchase the pills from a female contact, who was unknown to Palma.  After this transaction, Palma and Sullivan parted ways, but Sullivan soon called Palma to tell him that the pills were not oxycontin.  Because Sullivan "was insistent" on recovering the money for the fake oxycontin pills, Palma picked Sullivan up and followed his directions to a house, where Sullivan got out of the car, with the .45 caliber pistol tucked in his waistband, and knocked on the door of the house.  Palma saw Sullivan arguing with a man who later turned out to be Criswell.  Palma did not witness the shooting because he was making the block in his car when Sullivan fired on Criswell, but he heard what sounded like gunshots.  As he approached the house, Sullivan ran to his car, with the .45 caliber pistol, and they drove away.  Sullivan left the gun with Palma, who testified that he got rid of it.  *Doc. 14-2, Tr. 563-588.*

Palma's trial testimony was largely consistent with Sullivan's statement to the police, in which he admitted:  (1) purchasing pills from Charity King, Criswell's girlfriend;  (2)  discovering that the pills were not what she had represented them to be;  (3)  Palma drove him to Criswell's house so that he could get Palma's money back;  (4) Criswell came to the door and they argued;  and (5)  pulling out the .45

pistol and firing it at Criswell after he "jumped off the porch" at him. *Doc. 31*, DVD of Sullivan's video interview.

In his cross-examination of Palma, Mr. Brasuell established that Sullivan's sole purpose in going to Criswell's house was to get the money back for the fake oxycontin pills, *not* to "shoot anybody." *Doc. 14-2, Tr. 584*. This testimony was helpful to Sullivan's defense and may well have led the jury to find Sullivan not guilty of first-degree murder. Thus, any effort by Mr. Brasuell to attack Palma's credibility (as Sullivan seems to argue he should have) would have risked the jury rejecting the portions of Palma's testimony that were helpful to Sullivan's defense.

There is *nothing* in the record to suggest that Palma knew any other information, not elicited at trial, that could have been helpful to Sullivan's defense. Sullivan has failed to demonstrate either inadequate performance or prejudice. "[H]ow much to impeach a witness is generally a matter of trial strategy left to the discretion of counsel," and "even if [a defense attorney] was ineffective for not locating additional impeachment evidence and questioning [a witness] in all the [possible] ways," a habeas petitioner still must establish prejudice under *Strickland* by demonstrating a reasonable probability that the outcome of his criminal proceeding would have been different. *Dansby v. Hobbs,* 766 F.3d 809, 835 (8th Cir. 2014).

The trial court's Rule 37 decision to reject Claim 9 was not based on either "an unreasonable application" of "clearly established Federal law," or "an unreasonable determination of the facts" based on the evidence presented at trial. Thus, Claim 9 is without merit and should be dismissed.

### 6. Counsel's Failure to Advise Sullivan of His Right to Testify (Claim 10)

Sullivan contends that he was not "adequately advised" of his right to take the stand at trial and testify, and that he neither knowingly nor intelligently waived the right to testify during his trial. *Doc. 2, p. 13*. In his Rule 37 petition, Sullivan expanded this argument to include the assertion that he told Mr. Brasuell he wanted to testify, but Mr. Brasuell "insisted" that Sullivan *not* testify. *Doc. 14-14, p. 6*.

In rejecting this argument in its Rule 37 decision, the trial court explained:

> At the conclusion of the case in chief by the State of Arkansas, and outside the hearing of the jury, the Defendant was placed under oath and made a voluntary decision not to testify.  (TR 000679-TR 000672)

*Id. at p. 20, ¶ 15*.[20]

---

[20] According to the trial transcript, Sullivan and Mr. Brasuell had the following on-the-record exchange, outside the presence of the jury:

        Q. :     George, I have advised you that you have a Constitutional Right to testify in this case, right?

        A. :     Yes, sir.

        Q.:     You have a Constitutional Right not to testify, right?

        A.:     Yes, sir.

        Q.:     And which do you choose to do?

        A.:     I choose not to testify.

The trial court's Rule 37 decision to reject Claim 10 was not based on either "an unreasonable application" of "clearly established Federal law," or "an unreasonable determination of the facts" based on the evidence presented at trial. Thus, Claim 10 is without merit and should be dismissed.

### 7.    Counsel's Alleged Ineffectiveness During Sentencing (Claims 11-13)

Sullivan alleges that, during the sentencing phase of his trial, Mr. Brasuell provided virtually no assistance (Claim 11);  failed to investigate and interview any character witnesses who could have testified to Sullivan's troubled childhood, dysfunctional family, and past mental history (Claim 12); and failed to adequately argue the case for a more lenient sentence (Claim 13).

The trial court rejected all three of these claims in its Rule 37 decision:

> [Sullivan] alleges that Mr. Brasuell failed to investigate and interview character witnesses for the sentencing phase of the trial.  These allegations are merely a conclusion and not supported by any affidavits

---

Q.:    And do you do that of your own free will?
A.:    Yes, sir.

Q.:    And are you under the influence of any drugs or alcohol?
A.:    No, sir.

Q.:    Are you making this [decision] because you believe it is in your best interest?
A.:    Yes, sir.

*Doc. 14-2, Tr. 671-672*.  Thus, the record proves that Sullivan's allegations in support of this claim are contrary to the facts.

from any of the alleged witnesses.  Additionally, throughout the trial Mr. Brasuell clearly worked through mitigation issues and was successful in convincing the jury to by-pass the first degree murder charge and return a verdict on the lesser included offense of second degree murder.  In the event that those character witnesses were called by the defense they could possibly be subject to cross-examination regarding [Sullivan's] prior felony convictions of Theft of Property, a second Theft of Property, Possession of Firearms by Certain Persons, Delivery of a Controlled Substance and Battery in the Second Degree. It is of note that one of the witnesses referenced by Defendant is Reagan Pirtle.  The Defendant alleges that Reagan Pirtle would testify that State's witness, Richard Palma, never gave [Sullivan] a gun on the offense date of the present charges.  However, on September 17, 2014, [Sullivan] entered into a voluntary plea agreement to the charge of Possession of Firearms by Certain Persons.  This count was severed at the request of [Sullivan] and would have been presented to a separate jury panel.  As such, the Court can find no error in failing to call any of the referenced witnesses.  In addition, [Sullivan] had failed to establish that his attorney was ineffective for failing to call any of the individuals listed in his Rule 37.1 Postconviction Petition.

*Doc. 14-6, p. 21, ¶ 16.*

During the sentencing phase of Sullivan's trial, the only witness was Criswell's mother, Eula Brewer, and she was called by the State.  She testified about the devastating impact of losing her baby boy to a senseless murder and the loss to her son's eight kids, who would never see their father again.  *Doc. 14-2, Tr. 736-738.*  Mr. Brasuell wisely elected not to cross-examine Ms. Brewer.   Mr. Brasuell also declined to call any witnesses.  The jury sentenced Sullivan to fifty-five years, five years less than the maximum sentence for second degree murder.  *Id. at Tr. 911.*

Sullivan identifies various character witnesses who he claims could have testified to his good character, troubled childhood, and dysfunctional family.[21] Sullivan also claims Mr. Brasuell should have called Dr. Wood and Dr. Rattan.

Under Arkansas law, "relevant character evidence … considered inadmissible during the guilt phase of a criminal trial may be admissible during the sentencing phase." *Huff v. State,* 2012 Ark. 388, at 7-8, 423 S.W.3d 608, 612. This includes evidence of uncharged criminal conduct, or even charges of which the defendant is later acquitted. *Id.* (upholding admission of sentencing phase testimony about a similar instance of the defendant's breaking into a nearby home). If Mr. Brasuell had called the identified character witnesses, all friends and family, they undoubtedly would have been cross-examined about specific instances of prior charged and uncharged conduct by Sullivan. In his mental evaluations, Sullivan admitted to a host of disturbing misdeeds, including starting fires at age 7 and torturing and killing dogs at age 9. *Doc. 14-2, Tr. 131* (ASH Evaluation). Any character witness called by Mr. Brasuell would have been vigorously cross-

---

[21] For example, he identifies: (1) Angie Drew, a friend for over twenty years, who would have testified "as to his character, childhood, dysfunctional family, etc."; (2) Christy Jones, an associate for over 25 years, who would have testified that Sullivan "is a good person who comes from a troubled childhood and dysfunctional family"; (3) Reagan Pirtle, his cousin, who would have testified to his "character, troubled childhood, dysfunctional parent, etc."; (4) Rebecca Cole, APN, his counselor, who would have testified to his "recent mental health issues, his character, his troubled childhood, his fear of being jumped on and assaulted again, etc."; and (5) Cheryl Eoff, who would have testified to his character, previous suicide attempts, and a beating Sullivan had endured by five "skin heads." *Doc. 2, pp. 15-17.*

examined about those misdeeds and others that Sullivan may have committed, including his prior criminal convictions.

If the mental health professionals testified, they also would have been subjected to cross-examination on the following findings, in their reports: (1) Sullivan had the mental capacity to appreciate the criminality of his conduct and to conform his conduct to the law, as found in Dr. Wood's Evaluation; (2) Sullivan's off the chart scores consistent with an attempt to feign mental illness, as found in the ASH Evaluation; and (3) Sullivan's high scores on a violence and risk assessment that placed him at high risk for recidivism and future violence, and which a doctor administering the test concluded "was not due to a statutory mental disease or mental defect but rather due to Mr. Sullivan's antisocial personality and severe substance dependence," *Doc. 14-2, Tr. 132* (ASH Evaluation). This testimony would have made Sullivan look dangerous, manipulative, and dishonest.

The trial court's Rule 37 decision to reject Claims 11, 12 and 13 was not based on either "an unreasonable application" of "clearly established Federal law," or "an unreasonable determination of the facts" based on the evidence presented at trial. Thus, these ineffective assistance of counsel claims are without merit and should be dismissed.

### 8.   Counsel's Failure to Impeach Josh Hardiman With An Inconsistent Statement (Claim 14)

Sullivan argues that Mr. Brasuell failed to impeach Josh Hardiman, an eyewitness to the murder, with a prior inconsistent statement. According to Sullivan, if Mr. Brasuell had done so, it would have "substantially damaged" the prosecution's theory of the case and "bolstered" his justification defense. *Doc. 2 p. 19*. Sullivan fails, however, to identify the inconsistent statement. This failure alone justifies the dismissal of the claim.

In its Rule 37 decision rejecting this claim, the trial court explained:

> [T]he Defendant's allegation is merely a conclusion and does not set forth any alleged prior statement inconsistencies. During the jury trial, Mr. Brasuell performed a thorough cross-examination of Mr. Hardiman. Not only does Mr. Brasuell provide Mr. Hardiman with a copy of his statement to law enforcement, he also utilizes an alleged prior inconsistent statement by Mr. Hardiman in both discussions with the Court and during cross-examination of Mr. Hardiman. As such, this allegation is without merit.

*Doc. 14-6, p. 21, ¶ 17* (omitting citations to the record).

Hardiman, a long-time friend of Criswell's, testified on direct examination that Criswell was prepared to fight Sullivan "with his hands . . . like a grown man." Instead, Sullivan pulled his gun out and fired multiple shots at Criswell. *Doc. 14-2, Tr. 407-08*. On cross-examination, Mr. Brasuell attempted to impeach Hardiman by claiming that Hardiman had urged the victim to go outside to fight Sullivan and "squash that shit." *Id. at Tr. 414*. However, Hardiman *denied* making the statement and claimed Sullivan "wasn't trying to fight at all." *Id. at Tr. 415*.

Sullivan offers nothing to show either that his counsel's cross-examination of Hardiman was constitutionally deficient or that a different cross-examination would have produced a more favorable result. "[H]ow much to impeach a witness is generally a matter of trial strategy left to the discretion of counsel," and "even if [a defense attorney] was ineffective for not locating additional impeachment evidence and questioning [a witness] in all the [possible] ways," a habeas petitioner still must establish prejudice under *Strickland* by demonstrating a reasonable probability that the outcome of his criminal proceeding would have been different. *Dansby,* 766 F.3d at 835.

The trial court's Rule 37 decision to reject Claim 14 was not based on either "an unreasonable application" of "clearly established Federal law," or "an unreasonable determination of the facts" based on the evidence presented at trial. Thus, Claim 14 is without merit and should be dismissed.

### III. Conclusion

Sullivan has failed to demonstrate that he is entitled to habeas relief on any of the claims asserted in his 28 U.S.C. § 2254 Petition for Writ of Habeas Corpus. Accordingly, all of those claims should be denied and this action should be dismissed, with prejudice.

IT IS THEREFORE RECOMMENDED THAT:

40

1.      The Petition for a Writ of Habeas Corpus (*Doc. 2*) be DENIED, and this habeas action be DISMISSED, WITH PREJUDICE; and

2.      A Certificate of Appealability be DENIED; *see* 28 U.S.C. § 2253(c); Rule 11(a), Rules Governing § 2254 Cases in United States District Courts.

DATED this 30th day of November, 2018.


_____
UNITED STATES MAGISTRATE JUDGE